FILED

Mar 30 2020, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

Craig E. Beougher
Eric C. Welch
Welch & Company, LLC
Muncie, Indiana

ATTORNEYS FOR APPELLEE
GREGORY L. WILSON, SR.

Curtis T. Hill, Jr.
Attorney General

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

Doneisha Posey
Indiana Civil Rights Commission
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
SHELLEY LINDER

Martin R. Shields
Attorney at Law
New Castle, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Douglas Furbee,<br>Furbee Properties, LLC,<br>Furbee Properties I, LLC,<br><br>*Appellants-Defendants,*<br><br>v.<br><br>Gregory L. Wilson, Sr. in his<br>Official Capacity as Executive | March 30, 2020<br><br>Court of Appeals Case No.<br>19A-PL-1756<br><br>Appeal from the<br>Delaware Circuit Court<br><br>The Honorable<br>Marianne L. Vorhees, Judge<br><br>Trial Court Cause No.<br>18C01-1805-PL-44 |

Director of the Indiana Civil
Rights Commission,

*Appellee-Plaintiff*

and

Shelley Linder,

*Appellee-Intervenor*

**Vaidik, Judge.**

# Case Summary

This case involves an apartment tenant's request for an emotional-support animal. The tenant lived at an apartment with a no-pet policy. The tenant asked the landlord if she could have an emotional-support animal and provided a letter from a licensed family and marriage therapist, which said that the tenant had a disability and needed an emotional-support animal to help alleviate her symptoms. The letter, however, identified no disability or symptoms. The landlord requested more information from the tenant, and when the tenant did not provide the requested information and instead brought the animal into her apartment, the landlord evicted her. The Indiana Civil Rights Commission filed a complaint against the landlord, arguing that it failed to accommodate the tenant's request for an emotional-support animal in violation of the Indiana Fair Housing Act. The landlord sought summary judgment, arguing that it did not have enough information to evaluate the tenant's request for an

accommodation because the therapist's letter failed to identify the tenant's disability. The trial court denied summary judgment, and the landlord now appeals.

[2] Before a landlord makes a decision about a tenant's request for an accommodation, it can conduct a "meaningful review" to determine whether the accommodation is required; this review includes requesting documentation and opening a dialogue. Here, when the landlord asked the tenant for more information, the tenant did not respond. By not giving the landlord information about her disability and disability-related need for the animal, the tenant caused a breakdown in the process. Without this basic information, the landlord could not meaningfully review the tenant's request for an emotional-support animal. We therefore reverse the trial court and remand with instructions for the court to enter summary judgment in favor of the landlord.

## Facts and Procedural History

[3] On October 12, 2016, Shelley Linder ("Tenant") entered into a rental lease with Furbee Properties, LLC ("Landlord"), for an apartment in Muncie.[1] According to the lease, Tenant agreed "[n]ot [to] allow dogs, cats or other animals or pets on the premises." Appellants' App. Vol. II p. 27. In addition, the lease

---

[1] Furbee Properties I, LLC, and Douglas Furbee are also defendants. For simplicity, we refer to all three defendants as "Landlord."

provided that if a pet was discovered on the leased premises, Landlord could

charge a $500 fine and evict Tenant. *Id.* at 33.

[4] Approximately five months later, on March 28, 2017, Tenant asked Landlord if

she could have an emotional-support animal. Tenant gave Landlord the

following letter from Monique Snelson, LMFTA:



## Monique Snelson, LMFTA

Mar 27, 2017

Dear Landlord:

Ms. Shelley Linder has been assessed by me and meets the functional limitations imposed by her disability. Shelley meets the definition of disability under the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act of 1973.

Shelley has certain limitations regarding coping with symptoms that stem from her disability. An emotional support animal will significantly help in alleviating Shelley's symptoms, and will enhance her ability to live independently and to fully use and enjoy the dwelling unit you own and/or administer. I am prescribing an emotional support animal that will assist Shelley in coping with her disability. This is applicable to her cat, Poppy, a 3 lb American Shorthair.,

I am familiar with the voluminous professional literature concerning the therapeutic benefits of assistance animals. This includes the physiological and psychological benefits they provide people with disabilities, as experienced by Shelley. Upon request, I will share citations to relevant studies that point to some of the following: relief from feelings of isolation, an increased sense of well-being, mood improvement, and increased optimism, reduction in debilitating symptoms, encouragement for social interactions, and around-the-clock, emotional support. With Ms. Linder's consent, I can answer any questions regarding my recommendations. This letter will cover the patient between the periods of 03/27/2017 – 03/27/2018, at which time Shelley will be assessed for continued need of an emotional support animal.

Shelley currently has a clinical diagnosis in place.

Sincerely,

*Monique Snelson*

Monique Snelson, LMFTA

PATIENT ASSESSMENT ID: 1027494

Indiana License # 85000283A
www.moniquetrumpsnelson.tk

moniquesnelson.lmfta@gmail.com
(574) 876-9326

27

Doc ID: cdfcd38a4b27ff4e8a434bf048883b754a8a7479

Linder's App. Vol. II p. 27.[2]

On April 11, Landlord sent Tenant a letter stating that in order for it to determine whether the accommodation would be allowed, it needed "additional information," as Tenant's letter did "not provide all of the details necessary to make a reasonable decision." Appellants' App. Vol. II p. 43. Landlord asked Tenant for the following information:

> [P]lease specify the number of sessions you had with Monique Snelson and an approximation of how long each session lasted. We will also need to know your disability. Without providing any specific details regarding your disability, please advise us of the disability so that we can make an informed decision.

*Id.* Landlord also enclosed a letter it planned to send to Snelson once Tenant gave her consent. The letter asked Snelson to provide the following information:

> 1. The nature of the mental or physical impairment that is disabling, including a reference to the DSM 5 description of the

---

[2] Landlord suggests that Snelson's letter is "consistent with bogus prescription letters that are readily available on the internet." Appellants' Br. p. 19. Our legislature addressed this concern when it enacted Indiana Code chapter 22-9-7 effective July 1, 2018 (after the events in this case). Specifically, Indiana Code section 22-9-7-12 provides that it is a Class A infraction for a health-service provider to "verif[y] an individual's disability status and need for an emotional support animal without adequate professional knowledge of the individual's condition to provide a reliable verification" or "charge[] a fee for providing a written verification for an individual's disability status and need for an emotional support animal" without providing another service to the individual.

condition and a statement of what major life activity this disability interferes with.

2. Was a physical examination conducted of your patient?

3. Did you interview the patient in person?

4. How many sessions did you have with the patient and approximately how long was each session?

5. A statement from you indicating that you conducted an examination of the patient appropriate for the diagnosis of the mental impairment in question under the professional guidelines applicable to a Licensed Clinical Social Worker and as described in the DSM 5.

6. Please provide a photocopy of your license.

*Id.* at 44. Landlord asked Tenant to "sign the consent on the bottom of the page" so it could speak to Snelson. *Id.* Tenant neither provided the additional information to Landlord nor signed the consent so that Landlord could talk to Snelson. As a result, Landlord took no action on Tenant's request for an emotional-support animal.

[6] In August 2017, Tenant brought the cat into her apartment. On August 4, Landlord charged Tenant a fine for having the cat in her apartment and told her she had seven days to remove the cat. Tenant did not remove the cat. On August 31, Landlord told Tenant that if she didn't remove the cat within seven days, she would face further fines or actions. Tenant kept the cat in her

apartment until December, when she was evicted. Later that month, Tenant filed a complaint with the Indiana Civil Rights Commission.

[7]     In July 2018, the Civil Rights Commission, on behalf of Tenant, filed a complaint against Landlord in Delaware Circuit Court.[3] The complaint alleged "discrimination on the basis of disability and handicap in violation of the Indiana Fair Housing Act, IC 22-9.5-1-1 et seq." *Id.* at 11. Specifically, the complaint alleged that Landlord failed to grant Tenant a reasonable accommodation. Landlord moved for summary judgment, arguing it did not have enough information to evaluate Tenant's request for an accommodation because Snelson's letter "failed to identify the Tenant's disability" and "did not state what major life activity was impaired."[4] *Id.* at 59. Following a hearing, the trial court denied summary judgment. The court recognized that a landlord may meaningfully review a tenant's request for an accommodation. However, the court found that Landlord's questions (such as how many times Tenant and Snelson met, how long the visits were, and whether a physical examination occurred) "exceeded the reasonable inquiry to which [it was] entitled." *Id.* at 159.

---

[3] Tenant filed a motion to intervene as plaintiff, which the trial court granted.

[4] The Civil Rights Commission filed a motion in opposition to Landlord's motion for summary judgment and designated several documents, including Tenant's medical records from Dr. Keith Dinklage, M.D. (which reflect that she suffers from anxiety), and records from Snelson. Appellants' App. Vol. II pp. 79-106. However, it is undisputed that these records were not provided to Landlord before the eviction. Accordingly, they have no bearing on the issue in this case.

[8] This interlocutory appeal now ensues.[5]

# Discussion and Decision

[9] Landlord contends that the trial court erred in denying its motion for summary judgment. We review motions for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). That is, "The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

[10] Under the Indiana Fair Housing Act (IFHA), it is unlawful to discriminate based on disability. Ind. Code § 22-9.5-5-5. The IFHA borrows heavily from the federal Fair Housing Act (FHA), with many parallel provisions and similar language. *Ind. Civil Rights Comm'n v. Cty. Line Park, Inc.*, 738 N.E.2d 1044, 1048 (Ind. 2000). Indeed, the first section of the IFHA declares that its purpose is "[t]o provide rights and remedies substantially equivalent to those granted under federal law." Ind. Code § 22-9.5-1-1. When interpreting the FHA, federal courts look to policy statements from the United States Department of Housing and Urban Development (HUD) and the United States Department of Justice (DOJ). *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d

---

[5] Tenant and the Civil Rights Commission have each filed an appellee's brief. For simplicity, we refer to the appellees' arguments as Tenant's argument.

1277, 1286 n.3 (11th Cir. 2014). Consequently, we look to federal statutes, federal cases, and policy statements in resolving the issue in this case.

[11] Under federal law, to prevail on a failure-to-accommodate claim, a plaintiff must establish: (1) the plaintiff is a person with a disability within the meaning of the FHA[6]; (2) the plaintiff requested a reasonable accommodation for the disability; (3) the requested accommodation was necessary to afford the plaintiff an opportunity to use and enjoy the dwelling; and (4) the defendant refused to make the accommodation. *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1225-26 (11th Cir. 2016); *Bhogaita*, 765 F.3d at 1285. Under the FHA, disability means "a physical or mental impairment which substantially limits one or more . . . major life activities." 42 U.S.C. § 3602(h)(1); 24 C.F.R. § 100.201. "Physical or mental impairment" includes any "mental or psychological disorder, such as . . . emotional or mental illness." 24 C.F.R. § 100.201(a)(2). "Major life activities" means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* at (b).

---

[6] The FHA refers to discrimination based on "handicap" rather than "disability." *See* 42 U.S.C. § 3604(f). Disability scholars, however, generally prefer the term "disability" to "handicap," and the Americans with Disabilities Act (ADA) reflects that preference. *Bhogaita*, 765 F.3d at 1285; *see also* Joint Statement of HUD and DOJ, *Reasonable Accommodations Under the Fair Housing Act* at 1 (May 17, 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_statement_ra.pdf. [https://.cc/X67C-T7ES] As other courts have done, we treat the terms interchangeably and elect to use "disability."

[12] We begin by pointing out that Landlord doesn't dispute the first three elements of Tenant's failure-to-accommodate claim. *See* Appellants' App. Vol. II p. 61. That is, Landlord doesn't dispute that Tenant is disabled or that the Tenant requested a reasonable and necessary accommodation. Indeed, Landlord notes it "routinely approve[s]" requests for emotional-support animals. Appellants' Br. p. 22. Instead, Landlord argues that it was not given enough information to meaningfully review Tenant's request for an accommodation and therefore cannot be found to have refused her request, which is the fourth element.

[13] As both parties acknowledge on appeal, the FHA does not demand that housing providers immediately grant all requests for accommodation. *Bhogaita*, 765 F.3d at 1285-86. Once a housing provider knows of a person's request for an accommodation, the provider can make a final decision, "which necessarily includes the ability to conduct a meaningful review" to determine whether the FHA requires the requested accommodation. *Id.* at 1286 (quotation omitted). This review includes "request[ing] documentation or open[ing] a dialogue." *Id.* at 1287; *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996). Generally, housing providers "need only the information necessary to apprise them of the disability and the desire and possible need for an accommodation." *Bhogaita*, 765 F.3d at 1287. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry." Joint Statement of HUD and DOJ, *Reasonable Accommodations Under the Fair Housing Act* at 14 (May 17, 2004), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/joint_stat

ement_ra.pdf. [https://.cc/X67C-T7ES] Certain impairments, including impairments that support a request for an emotional-support animal, may not be observable. HUD Notice, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* at 9 (Jan. 28, 2020), https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf. [https://perma.cc/QE5C-767U] In these cases, the housing provider may request information regarding "both the disability and the disability-related need for the animal." *Id.* However, "[h]ousing providers are not entitled to know an individual's diagnosis."[7] *Id.*

[14] Failing to make a timely determination after meaningful review amounts to a constructive denial of the requested accommodation, as an indeterminate delay has the same effect as an outright denial. *Bhogaita*, 765 F.3d at 1286. In assessing whether a constructive denial has occurred, "courts often consider whether the delay was caused by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons." *Bone v. Village Club, Inc.*, 223 F. Supp. 3d 1203, 1214 (M.D. Fla. 2016). As the Seventh Circuit has explained in the ADA context:

> [N]either party should be able to cause a breakdown in the
> process for the purpose of either avoiding or inflicting liability.

---

[7] We acknowledge that saying a landlord is entitled to know a tenant's disability but not diagnosis might cause some confusion. However, because Snelson's letter does not provide a diagnosis or disability and the parties don't make any argument about the difference, we need not address this issue.

> Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

[15] Here, the designated evidence shows that Snelson's letter—the only documentation that Tenant gave Landlord to support her request for an emotional-support animal—provides that Tenant "meets the definition of disability"; however, it identifies no disability. Snelson's letter also provides that Tenant "has certain limitations regarding coping with symptoms that stem from her disability." Again, the letter identifies no limitations or symptoms of the "disability." Landlord, at the very least, was entitled to know Tenant's disability and disability-related need for the animal. *See, e.g.*, *Bhogaita*, 765 F.3d at 1287; HUD Notice, *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act* at 9. Accordingly, Landlord was justified in trying to open a dialogue with Tenant and requesting more information from her.

[16] Tenant, however, claims that she didn't respond because Landlord's requests "went far beyond what it was permitted to ask." Civil Rights Comm'n Br. p. 16; *see also* Linder's Br. p. 11 ("[T]he Landlord's request for medical

documentation regarding the Tenant's mental health exceeded the legally permissible boundaries."). In other words, Tenant asserts that Landlord was being unreasonable, causing a breakdown in the process. In making this argument, Tenant claims that the facts in this case are "strikingly similar" to the facts in *Bhogaita*. Civil Rights Comm'n Br. p. 17.

[17] In *Bhogaita*, the homeowner brought into his condo a dog that exceeded the condominium association's weight limit for pets. When the condominium association demanded that the homeowner remove the dog in May 2010, the homeowner responded by giving the condominium association three letters from his psychiatrist, which stated that he was treating the homeowner for "[a]nxiety related to military trauma," his condition "limit[ed] his ability to work directly with other people, a major life activity," and his dog alleviated his symptoms. *Bhogaita*, 765 F.3d at 1282. In August, the condominium association sent the homeowner a request for more information, and the homeowner did not respond. In November, the condominium association sent the homeowner another request and said that if the homeowner did not respond by December 6, it would demand that he remove the dog from his condo. Thereafter, the homeowner filed a complaint with HUD and sued in federal court. The district court granted partial summary judgment to the homeowner, finding that the psychiatrist's three letters supplied "sufficient information" and that the condominium association's delay, as "evidenced by escalating requests for information, amounted to a constructive denial" of the homeowner's request for an accommodation. *Id.* at 1283.

[18] The condominium association appealed the district court's grant of partial summary judgment to the homeowner on the refusal-to-accommodate element. The Eleventh Circuit explained that the condominium association's "critical inquiries" were whether the homeowner's PTSD amounted to a qualifying disability and whether the dog alleviated the effects of the disorder. *Id.* at 1287. The court said that the psychiatrist's letters, which were provided to the condominium association **before** it requested additional information, contained all the information it needed to make a determination. *Id.* at 1286. That is, the letters "described the nature and cause of [the homeowner's] PTSD diagnosis, stated that [the homeowner] was substantially impaired in the major life activity of working, and explained that the dog alleviated [the homeowner's] symptoms." *Id.* at 1286-87. Accordingly, the court concluded that the condominium association's request for additional information "exceeded that essential for [its] critical inquiries" and affirmed the district court's grant of partial summary judgment to the homeowner. *Id.* at 1287.

[19] This case easily differs from *Bhogaita*. In *Bhogaita*, the condominium association knew the homeowner's disability and disability-related need for the animal but nevertheless requested more information from the homeowner. Here, however, Landlord did not know Tenant's disability or disability-related need for the animal when it requested additional information. This difference between the cases is critical.

[20]    Nevertheless, Tenant points out that some of the information the condominium association requested in *Bhogaita* is similar to what Landlord requested in this case. Specifically, Landlord asked Tenant for three pieces of information:

> [P]lease specify the number of sessions you had with Monique Snelson and an approximation of how long each session lasted. We will also need to know your disability. Without providing any specific details regarding your disability, please advise us of the disability so that we can make an informed decision.

Appellants' App. Vol. II p. 43. Even assuming that Landlord's questions about the number of sessions Tenant had with Snelson and an approximation of how long each session lasted were overbroad, the question about Tenant's disability was not. Tenant could have told Landlord her disability and chosen not to answer the other two questions. Tenant, however, did nothing. The overbreadth of some of the questions did not absolve Tenant from providing the required information. The same can be said about Landlord's proposed letter to Snelson. Again, even assuming that Tenant rightfully did not give consent because she believed many, if not all, of the questions to Snelson were overbroad, this still did not absolve Tenant from providing the required information. Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. *See Beck*, 75 F.3d at 1135. "A party that fails to communicate, by way of initiation or response, may be acting in bad faith." *Id.* Here, Tenant did not respond at all to Landlord, causing a breakdown in the process. Without information about Tenant's disability and disability-related need for the animal, Landlord could not

meaningfully review Tenant's request for an emotional-support animal. We therefore reverse the trial court and remand with instructions for the court to enter summary judgment in favor of Landlord.

[21] Reversed and remanded.

Mathias, J., and Tavitas, J., concur.